Filed 5/19/22  In re T.S. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re T.S. et al., Persons Coming Under the Juvenile Court Law. | B312342<br><br>(Los Angeles County Super. Ct. No. 20CCJP06247A, C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>M.B.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore.  Affirmed.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Principal Deputy County Counsel, for Plaintiff and Respondent.

M.B. (Mother) has three children, a 16-year-old daughter T.S., a 14-year-old son Mei.S., and a 12-year-old son Mes.S.[1] The juvenile court assumed jurisdiction over T.S. and Mes.S. (collectively, Minors) after finding there was a substantial risk the Minors would suffer serious physical harm as a result of Mother's unresolved mental and emotional problems that rendered her unable to adequately supervise or protect them.[2] The court removed Minors from Mother's custody, placed Minors with E.S. (Father), and then terminated dependency jurisdiction. Mother asks us to decide whether certain of the juvenile court's evidentiary rulings were correct and whether substantial evidence supports the court's jurisdiction finding and order removing the children.

## I. BACKGROUND

### A. *The Department Investigates the Minors' Welfare*

#### 1. *The referral and initial interviews*

In September 2020, an anonymous neighbor contacted a child protection hotline to report an incident involving Mother and her family. According to the report, Mother hit one of her sons while drunk and she encouraged her daughter to hit him as well. The reporting party also stated Mother smokes marijuana with her son on the front porch of her home.

---

[1] These were the children's ages at the time of the jurisdiction hearing.

[2] Mei.S. was named in the original petition but, for reasons we need not discuss, he was not included in the petition the court adjudicated.

A social worker from the Los Angeles County Department of Children and Family Services (Department) visited Mother's residence. Mother denied the anonymous report and said she had ongoing conflicts with her neighbors. Mother, who had prior dealings with the Department, said she did not want to be involved with the Department again. She declined to sign consent forms, provide the social worker with information, or allow the social worker to speak to her children.

Mother later reconsidered and allowed the social worker to speak to the children. The social worker assessed the family's apartment while present and saw the kitchen was stocked with food, the utilities were functioning, and the home appeared to be in fair condition with no visible safety hazards.

During the social worker's visit, Mother repeatedly said she was "fed up" and had "a lot to do." Mother disclosed her neighbors were violent and disrespectful, and she said one of her neighbors had stolen her car and totaled it. Mother declined to provide the social worker with the children's school or medical information, or to confirm the children's birthdates. While Mei.S. and Mes.S. were present when the social worker visited, T.S. was not and Mother refused to provide contact information for T.S.

Mes.S. denied that Mother drinks alcohol or smokes marijuana. He denied Mei.S. drinks or smokes with Mother, and he denied witnessing Mother or T.S. hitting Mei.S. Mes.S. said the neighbors harass Mother and have thrown rocks through his bedroom window in the past; he was unsure why the neighbors behave this way. Mes.S. became impatient with answering the social worker's questions while he was participating in virtual learning. He said he does not know his father, denied any

4

substance abuse or mental health problems in the family, and denied being afraid to remain at home.

Mei.S. similarly denied the allegations made by the child welfare hotline caller. He told the social worker that Mother did not drink alcohol and smoke marijuana, and he said he had never been physically harmed by Mother and T.S. Mei.S. said their neighbors bother Mother and record her whenever she leaves the house. He also said the neighbors threaten to hurt him and say they will beat him up (though they had not acted on these threats). Mei.S. said he speaks with Father on the phone, but he would not provide Father's name or contact information. Mei.S. denied being afraid of being in the home.

The social worker called Mother the day after the visit and asked if she would like to provide a statement regarding allegations that Mei.S. had been seen on social media smoking marijuana and holding a gun in a location that appeared to be Mother's home. (The social worker reported a neighbor played a video of Mei.S. "smoking what appeared to be marijuana and holding a gun." The social worker's report states Mother became "defensive and claimed the allegations are false. . . . [e]ven after [the social worker] tried to tell her [the social worker] observed the video."[3]) Mother became upset and told the social worker she was "through" with the Department. Over the following days, Department social workers attempted to contact Mother a few times, but Mother neither answered the phone nor immediately returned their calls.

---

[3]     The social worker's report was introduced in evidence during the proceedings below, but the neighbor's video was not.

5

Mother later called one of the Department social workers. She seemed upset and expressed frustration when the social worker said she intended to seek a warrant to take custody of T.S. Mother said the social worker and Department were "stupid" and said she would not speak with the social worker or allow her into Mother's home again. Mother then sent the social worker a text message saying she had been falsely accused and she did not want to deal with the social worker again. She called the social worker a "[t]errorist" and said she (Mother) was being harassed.

### 2. Other information

Early in the investigation, the social worker assigned to Mother's case spoke to a colleague who was investigating one of Mother's neighbors. That social worker reported the neighbor said Mother harassed their family, could be seen snooping around their property on security footage, and acted aggressively toward them. The family and Mother had restraining orders against each other.

During the investigation, one of Mother's neighbors, who wished to remain anonymous, reported they had video footage of Mother watching their car at night. The neighbor also claimed: Mother had thrown things at them in the past when children were present; Mother had threatened to run over a child due to conflict with the child's parents; and Mother has threatened to call Parking Enforcement on anyone who parks in her desired spot on the street.

The social worker investigating the welfare of Mother's children also spoke to a case worker from a 2017 dependency

proceeding involving the family.[4]  That case worker, Lasean Davis (Davis), said there had been concerns about Mother's mental health in the earlier proceedings.  (Mother often reported to Davis that she was being watched, followed, or had her things stolen.)  Davis said Mother was ordered to undergo a psychiatric evaluation but the case was closed even though she failed to complete the evaluation.

The social worker also spoke to social worker Ladaysha Hunter (Hunter), who investigated a referral involving Mother and her children in 2015 or 2016.  Hunter stated there were concerns for Mother's mental health during the investigation because Mother presented as paranoid and always thought people were after her, harassing her, or following her.  Mother had erratic interactions between herself, her neighbors, and the school.  During that prior Department investigation, Mother and one of her neighbors had restraining orders against each other.

---

[4]     The 2017 dependency petition alleged Mother placed T.S. in an endangering situation by engaging in a volatile and aggressive confrontation with school personnel, making bizarre and derogatory statements, and striking a school employee's car windows.  It also alleged Mother engaged in volatile, aggressive, and threatening confrontations with school officials in other situations.  The juvenile court took jurisdiction.  Case notes show Mother placed surveillance cameras in her home and reported observing odd behavior by others and seeing people in the kitchen, but she could not provide evidence on the surveillance cameras.  Over the ensuing months, Mother failed to comply with court orders, but the home was clean and and the children were well groomed and dressed.  The social worker believed Mother was managing her stress better and the court terminated jurisdiction.

The neighbor said Mother took photos of her without her permission and reported Mother had ongoing disturbing behaviors.

Maternal aunt K.B. reported Mes.S. was afraid to be home because he was afraid of the neighbors. K.B. reported the neighbors throw rocks at Mother and the children and harass Mother whenever she leaves the home. Aunt K.B. said she had no concerns about Mother's mental health and reported Mother had not been diagnosed with a mental health disorder. She said, however, that Mother gets depressed due to the harassment from the neighbors.

Maternal Grandmother said Mother has active restraining orders against a few of her neighbors due to the ongoing conflict. Maternal Grandmother called the Department numerous times to ask that Department personnel check on Mother and the children. Maternal Grandmother believed Mother needs medication. She could not pinpoint Mother's issues, but she said things "just don't seem right."

### 3. Removal of the Minors

In early November 2020, the social worker was notified Mother had been arrested, apparently for violating a restraining order, and released three days later. Relatives took the Minors in when Mother was arrested, but Mei.S. ran away. Later that month, the Department obtained an order authorizing the children's removal from Mother's care. When a Department social worker called Mother to inform her of the warrant for removal, Mother stated she did not want the social worker visiting her home. The social worker sent her a copy of the warrant via text message and delivered a physical copy to

maternal aunt C.B.  Mei.S. and Mes.S. were present at aunt C.B.'s home, but T.S. was with a relative in Las Vegas.  The social worker informed aunt C.B. that T.S. would need to return to California.

T.S. contacted the social worker and denied that Mother or Mei.S. smoke marijuana or drink alcohol.  T.S. denied ever hitting Mei.S. and denied Mother uses physical discipline.

### B.      The Dependency Petition and Early Proceedings

The Department filed a one count dependency petition in November 2020 alleging all three children had suffered, or there was a substantial risk they would suffer, serious physical harm as a result of Mother's failure or inability to supervise and protect them.  Specifically, the petition alleged: Mother has unresolved mental and emotional problems that left her unable to provide regular care to the children, Mother failed to obtain mental health services for her mental and emotional problems, and Mother's mental and emotional condition endangers the children's physical health and safety and places them at risk of serious physical harm and danger.

The court held a detention hearing in December 2020; Mother did not appear.  The court removed the children from Mother and released them into Father's custody.

The court scheduled an arraignment hearing for January 8, 2021.  Mother again did not appear.  The court continued the matter and instructed Mother's attorney to reach out to her.  The court held the continued hearing on February 10, 2021.  Mother failed to appear again and Mother's attorney reported she was unable to contact Mother.  The court instructed the attorney to

9

continue reaching out to Mother to inquire whether Mother wanted to have counsel appointed.

Eventually, the court held an arraignment hearing on March 10, 2021, at which Mother appeared. The court appointed counsel for Mother.

C.    *Further Department Investigation*
1.    *Interviews*

T.S., in an interview with a Department social worker, said the neighbors cause problems for Mother. She said Mother could probably benefit from counseling but she also said she had never seen Mother act weirdly or erratically. T.S. was in the care of her adult maternal cousin and T.S. said she loved being there. The maternal cousin said T.S. spent a great deal of time in her care prior to the dependency case. T.S. wanted to remain with her cousin.[5]

Mes.S., during his interview, said he thought Mother would benefit from counseling so she would have someone to talk to. He said that when the neighbors start acting weird he calls his maternal aunt C.B. or Maternal Grandmother to take him to the aunt's house. Mes.S. wanted to stay with aunt C.B. or, as a second choice, with T.S. and the maternal cousin.

Mother did not make herself available to the Department for a further interview; she changed her phone number twice and

---

[5]    According to a Department report, T.S. said: "I really want to remain in the care of my cousin . . . . I am always with her and feel that I can focus and finish school and get prepared for college in her care. She has been very helpful for me and showing me the right steps to take to be able to go to college."

10

family members reported she would continue changing it until the Department stopped contacting her.  The Department was also unable to contact Mei.S.

Maternal aunt C.B. said Mother has always been paranoid and started "acting weird" when T.S. was born.  Aunt C.B. reported Mother thinks people are watching her and opined that Mother needs help.  Aunt C.B. told the social worker that Mes.S. was usually with her, and she said he could stay as long as he liked.

Maternal Grandmother opined that Mother is "crazy." Maternal Grandmother said she wished she could get Mother "the help that she needs and place her in a hospital" because there was "clearly something wrong" with her.  Maternal Grandmother said Mother "was not always like this" and speculated something may have happened to her around the time she turned 21 years old.

### 2. *Video evidence*

On April 9, 2021, the Department submitted a last minute information report summarizing four videos that the Department characterized as displaying erratic and volatile behavior by Mother.[6]  The summaries stated the following.

In the first video, Mother is shouting obscenities.  A child comes up on a bike.  Mother grabs the bike from the child and pushes the child back while shouting obscenities.

In the second video, Mother is heard shouting obscenities and insults.  Mother shouts for someone to come outside.  Mother

---

[6]     The videos themselves are not included in the appellate record.

11

continues to scream and shout, repeatedly making death threats (e.g., "I'm going to send you to the cemetery tonight bitch!").

In the third video, Mother is yelling at another woman. Mother gets in the other woman's space, then walks away. Mother insults the other woman and uses obscenities.

In the fourth video, Mother is shouting at someone while approaching that person holding a yellow rod in a threatening manner. Mother holds the rod like a baseball bat and goads the other person, telling him or her "come on."

### D.    Mother's Evidentiary Objections

On Wednesday April 7, 2021, Mother served a document on the Department captioned "Objection to Inadmissible Statements and Evidence Contained in Social Worker Reports [Welfare & Institutions [Code] Section 355(c)[7] and Evidence Code Sections 402, 702, 720, and 1401(b)]" by which she generally objected to "all hearsay and otherwise inadmissible statements" in the social worker reports and attachments. Mother specifically identified the Detention Report and Jurisdiction/Disposition Report as documents to which she was objecting.

Mother specifically objected to statements by the following individuals if she were given no opportunity to cross-examine them:  (1) the anonymous neighbor who reported in September 2020 that Mother was drunk and beating up her son; (2) anonymous callers who made reports to the Department in years prior to the commencement of this dependency investigation, including anonymous callers who reported Mother is probably

---

[7]    Undesignated statutory references that follow are to the Welfare and Institutions Code.

12

mentally ill; (3) individuals in the videos referenced in the Jurisdiction Report, Removal Order, and Detention Report; (4) Maternal Grandmother; and (5) Department Dependency Investigator Rysha Jones (Jones).  Mother asked the Department make available "all hearsay declarants that [it] intends to rely on for evidence in support of a judicial finding sustaining any of the allegations against [Mother]" and further requested the Department "make available, on one hour notice, [Department] Dependency Investigator . . . Jones."

### E.    *The Jurisdiction and Disposition Hearing*

The juvenile court held a jurisdiction and disposition hearing on Monday April 12, 2021.  Jones, who authored the Department's jurisdiction and disposition report, testified.  The court denied Mother's evidentiary objections as untimely, sustained the jurisdiction allegations, and removed Minors from Mother's custody.  We will elaborate.

### 1.    *Rulings on evidentiary issues*

The Department presented an exhibit list with nine exhibits: seven Department-prepared reports, a DVD with the four videos we previously described, and a transcript of these videos.  The Department asked the juvenile court to find Mother's section 355 objections untimely because it did not receive the objections until Thursday, April 8, 2021, which left insufficient time (two business days) to permit witnesses to be subpoenaed.[8]  Mother responded that if the objections were untimely, the

---

[8]    As mentioned, the Department did make its own investigator Jones available to testify.

13

proper remedy would be a continuance of the hearing because she had a right to cross-examine the neighbors referenced in the Department's reports.

Mother also orally objected to admission in evidence of the DVD videos and associated transcripts as well, arguing they had been produced by the Department too late, i.e., on Thursday, April 8, 2021. The Department responded the timing of the videos' production could not have prejudiced Mother's defense because the videos combined amounted to less than five minutes.

The court denied Mother's evidentiary objections as untimely but stated it would give the hearsay statements the appropriate weight. The court also noted Mother had not submitted a written motion for a continuance. The Department's exhibits were admitted in evidence and the court also took judicial notice—without objection—of previously sustained petitions, case plans, and minute orders in the aforementioned 2017 dependency proceeding that involved social worker Davis.

### 2. Argument and ruling on jurisdiction and disposition

Mother asked the court to dismiss the allegations because the Department failed to establish Mother's mental health puts her children at risk of harm. Mother also argued there was no evidence she had been diagnosed with a mental illness.

Counsel for Minors argued the Department proved Mother had unresolved mental and emotional problems that hindered her ability to care for Minors—emphasizing T.S. had effectively made a safety plan for herself prior to the filing of the dependency petition by going to live with her maternal cousin and apart from Mother. Counsel also noted that both Minors

14

stated they thought Mother would benefit from counseling. The Department's attorney similarly argued T.S. making a safety plan for herself was an indication there was a nexus between Mother's problems and a risk of harm; because Mes.S. was not able to make a plan for himself, he would be in Mother's care and at risk due to her dangerous behavior without intervention. The Department's attorney further argued Mother's volatility and aggressive confrontational behavior were at issue in the 2017 case and she was exhibiting continued unaddressed, unstable behavior. The Department's attorney believed the neighbors might have been antagonizing Mother but the videos provided with, and described in, the Department's last minute information report showed Mother acting erratically.

The juvenile court sustained the dependency petition's allegations and found Minors to be children described by section 300. The court reasoned Mother had unresolved mental and emotional problems going back to the earlier 2017 dependency proceedings and was still exhibiting aggressive and unstable behavior that previously involved school officials and now involved neighbors. The court adopted the arguments of Minors' counsel and the Department as its own and found Mother's behavior created the requisite risk of harm justifying jurisdiction.

The juvenile court additionally found returning the children to Mother would pose a substantial risk to them until Mother accepted mental health treatment. The court determined the Department made reasonable efforts to avoid the need to remove Minors from Mother and ordered custody transferred to Father. The court then concluded it was in the interest of justice and best interests of the children to terminate dependency jurisdiction, which it did with a custody order giving Father full

15

physical and legal custody of the children and monitored visitation for Mother (the visits were to be monitored because she had not participated in individual counseling and a mental health evaluation).

## II.  DISCUSSION

Neither of Mother's evidentiary arguments on appeal is persuasive.  The juvenile court did not err in finding Mother's hearsay objections untimely because two business days was not a reasonable period of time to allow the Department to meet the objections.  The juvenile court also did not err in overruling Mother's objections to the DVD videos the Department produced at roughly the same time that she raised her hearsay objections because the evidence was of a different character: the videos were short (meaning little time was required for review) and the principal party who could have rebutted or provided context for the videos that depicted Mother's behavior was Mother herself.

We are also unpersuaded by Mother's challenge to the juvenile court's jurisdiction and disposition rulings.  There is substantial evidence supporting the juvenile court's determination that Minors were at substantial risk of serious physical harm from mother's inability to adequately supervise them: the video a social worker viewed of Mei.S. smoking and holding what appeared to be a gun was the most striking evidence of that, but other videos and the reports from Mother's own family members provided further reason to believe the requisite risk existed.  There is likewise substantial evidence that would support the juvenile court's finding by clear and convincing evidence that removal of the Minors from Mother's custody was required to avert a substantial danger to their physical health or

16

emotional well-being.  In addition to all the evidence supporting jurisdiction, Mother's resistance to the Department's intervention left little doubt that there were no means short of removal that would have ensured Mother would adequately supervise and protect Minors.

### A.  Evidentiary Issues
#### 1.  Mother's hearsay objections

Section 355, subdivision (a), provides that at the jurisdictional hearing, "[a]ny legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence."  Under subdivision (b), "[a] social study prepared by the petitioning agency, and hearsay contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)."

Subdivision (c)(1) provides that "[i]f a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more" specified exceptions.  Among the exceptions are exceptions for licensed social workers and hearsay declarants available for cross-examination.  (§ 355, subd. (c)(1)(C), (D).)

Section 355, subdivision (c)(2) provides: "For purposes of this subdivision, an objection is timely if . . . it gives the petitioner a reasonable period of time to meet the objection prior to a contested hearing."  We review the juvenile court's

17

determination to overrule Mother's hearsay objections as untimely for abuse of discretion. (*In re Cindy L.* (1997) 17 Cal.4th 15, 35; see also *In re Jordan R.* (2012) 205 Cal.App.4th 111, 121.)

Mother served her hearsay objections at the literal eleventh hour on April 7, 2021. The jurisdiction and disposition hearing took place five calendar days later, on April 12, 2021. The juvenile court reasonably concluded the objections were not timely as they provided the Department just two business days to locate and subpoena what would have been numerous witnesses (essentially all of whom were not employed by the Department) and the witnesses themselves would have had even less time to attempt to rearrange their schedules to comply with the subpoenas.

Mother compares section 355 to other provisions of the Welfare and Institutions Code and argues the "'reasonable' period of time" language requires flexibility. That may be, but the juvenile court did not impose an inflexible deadline here. Rather, it concluded under the specific circumstances (the extent of the objections, the amount of time the reports in question had been in possession of counsel for Mother, and the date on which the objections were served) that the Department did not have a reasonable period of time to meet Mother's hearsay objections. That was not an abuse of discretion.[9]

---

[9] The juvenile court was not obligated to grant a continuance to give effect to the late-filed objections when Mother did not comply with the statutory requirements for requesting such a continuance when serving her hearsay objections on the Department. (§ 352, subd. (a)(3) ["In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least

18

Moreover, even if the juvenile court had sustained Mother's objections, it still would not have been required to disregard the evidence to which Mother objected. "Section 355 . . . does not bar hearsay evidence at a jurisdictional hearing but, if a timely objection is made and no hearsay exception applies, the evidence must be corroborated. [Citation.]" (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1280; see also *In re B.D.* (2007) 156 Cal.App.4th 975, 984 [when the mother in a dependency proceeding raised a hearsay objection to the children's statements in a social worker's report, "the objection meant that uncorroborated, the hearsay statements did not constitute substantial evidence and could not be used as the exclusive basis for finding jurisdiction under section 300"].) There was significant corroborative evidence for some of the statements Mother challenged as hearsay, and even where such corroboration was absent, the juvenile court was still permitted to consider the evidence—and the court itself remarked at the hearing that it would give hearsay evidence only the weight it was due.

### 2. *Mother's timeliness objection to the video evidence*

Mother also argues the juvenile court erred by admitting videos the Department produced to her on Thursday, April 8, 2021, on the ground that they were untimely. Mother argues

---

two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance"].)

that if her section 355 objections were untimely, the trial court could not have deemed timely the Department's production of evidence at about the same time. This, however, equates two things that are not the same. As already discussed, the Department would have needed to subpoena a variety of witnesses to respond to Mother's hearsay objections. But to evaluate the videos the Department produced, Mother merely needed to review the videos, which the record reflects amounted to less than five minutes of footage, combined. If Mother wanted to rebut or provide context for the videos that depicted her behavior, she herself was the natural party to do so and compelling third party testimony was not necessary. The juvenile court accordingly did not abuse its discretion by declining to exclude the videos as untimely.[10]

## B. *Jurisdiction Finding and Disposition Order*

Section 300, subdivision (b)(1) authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child . . . ." This statutory basis for jurisdiction "does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56

---

[10] The reasons for our conclusion that there was no evidentiary error likewise disposes of Mother's contention that her constitutional due process rights were infringed by the juvenile court's evidentiary rulings. (See generally *In re A.B.* (2014) 230 Cal.App.4th 1420, 1436.)

Cal.4th 766, 773.) Our review of a juvenile court's determination that this statutory standard is met is for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633 [reviewing courts determine whether "'substantial evidence, contradicted or uncontradicted'" supports the juvenile court's order].) A parent's mental and emotional problems can provide the requisite basis for jurisdiction under section 300, subdivision (b)(1).

There was ample evidence here that Mother suffered from mental and emotional problems. The juvenile court took judicial notice of the dependency proceedings just four years earlier where a juvenile court asserted dependency jurisdiction based on Mother's aggressive, and in some instances bizarre, behavior, and the assigned social worker for those proceedings observed paranoid behavior by Mother and expressed concerns about her mental health. Mother's own mother described her as "crazy" and expressed a hope that she would be hospitalized to deal with her mental and emotional problems. Mother's sister C.B. largely echoed these concerns, telling Department personnel Mother had always been paranoid and "needs help." The DVD videos admitted in evidence also permitted the juvenile court to make firsthand observations of Mother's behavior. With all of this evidence before the juvenile court, no medical or expert diagnosis of mental illness was required.[11] (See, e.g., *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202 [if an assessment of whether a child is at substantial risk of harm at the hands of a

---

[11] Minors denied seeing Mother act erratically or in an unstable manner (though they did both opine she would benefit from counseling). The Minors' denial does not undermine the juvenile court's finding under the governing standard of review.

parent can be made "within ordinary experience," no expert psychological evaluation is necessary].)

It is well established, however, that a parent's mental and emotional problems alone are insufficient to justify dependency jurisdiction under section 300, subdivision (b)(1). (See, e.g., *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 563 ["The existence of a mental illness is not itself a justification for exercising dependency jurisdiction over a child"] (*Joaquin C.*).) Instead, there must always be a showing that a parent's mental health issues give rise to the risk of harm specified by the statute. (See, e.g., *In re James R.* (2009) 176 Cal.App.4th 129, 136 [mental illness does not create a presumption of harm, and a social services agency bears the burden of demonstrating how the children in question have been harmed or are at risk of harm].)

Substantial evidence supports the juvenile court's determination that the Department made this further showing here, i.e., that Mother's mental and emotional problems left her unable to provide adequate parental supervision and protect Minors from substantial risk of serious physical harm. Mother's 14-year-old son had been observed in a video smoking and holding what appeared to be a gun. Mother could be seen, on one of the DVD videos admitted in evidence, grabbing a bicycle from a child and pushing the child back while shouting obscenities. T.S. had removed herself from living with Mother and expressed a desire to remain living with her cousin, while Mes.S. spent significant amounts of time living with aunt C.B. Mother's own mother and her sister expressed a need to get Mother mental health help—with Maternal Grandmother going so far as to express a wish that her daughter would be hospitalized. All these facts, in our view, make this case quite different from other

22

cases where courts have found an insufficient connection between a parent's mental illness and a risk of harm to the parent's child. (See, e.g., *In re Joaquin C.*, *supra*, 15 Cal.App.5th at 562-563 [jurisdiction finding reversed where the "evidence was uncontroverted that [the child] was healthy, well cared for, and loved," there was "never an allegation or evidence that [the child] had been left alone or unsupervised," and the mother voluntarily agreed to accept mental health services].)

Substantial evidence likewise supports the juvenile court's order removing Minors from Mother's custody. Our application of the substantial evidence standard here is more stringent (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1011), but the evidence still suffices. In particular, in addition to all that we have already detailed that reveals a substantial danger to the Minors' health, safety, protection, and emotional well-being (§ 361, subd. (c)(1)), we also have Mother's steadfast and vociferous opposition to Department intervention. While services and treatment for Mother might mitigate or even eliminate the danger to Minors that exists on this record, Mother repeatedly made clear throughout the proceedings she wants nothing to do with the Department and even took affirmative steps, like changing her phone number, to make it difficult for the Department to contact her. She has also not acknowledged she has mental and emotional problems that would benefit from treatment. Because the focus of section 361 is on averting harm to children and a "parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170), we believe substantial evidence supports the juvenile court's removal decision here.

23

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.